LJW/DEH: USAO#2020R00340

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF MARYLAND

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | \* | |
| | \* | |
| v. | \* | CRIMINAL NO. _____ |
| | \* | |
| **VICTOR RIVERA,** | \* | **(False Statement to Federal Law** |
| | \* | **Enforcement, 18 U.S.C. § 1001(a)(2))** |
| **Defendant.** | \* | |
| | \* | |
| | \*\*\*\*\*\* | |

## INFORMATION

The United States Attorney for the District of Maryland charges that:

## COUNT ONE
### (False Statement to Federal Law Enforcement)

### Introduction

1. The Baltimore Police Department ("BPD") is an agency of the State of Maryland whose law enforcement jurisdiction includes Maryland's largest city, Baltimore.

2. Sworn members of the BPD must abide by the Law Enforcement Officer's Code of Ethics, which provides, in pertinent part:

> As a Law Enforcement Officer, my fundamental duty is to serve the community; to safeguard lives and property; to protect the innocent against deception, the weak against oppression or intimidation; the peaceful against violence or disorder; and to respect the constitutional rights of all to liberty, equality and justice. Honest in thought and deed both in my personal and official life, I will be exemplary in obeying the law and the regulations of my department … I recognize the badge of my office as a symbol of public faith and I accept it as a public trust to be held so long as I am true to the ethics of police service.

3. VICTOR RIVERA ("RIVERA") joined the BPD on July 11, 1994.

4. In February 2009, RIVERA was serving on a squad with K.G., I.L., W.J., C.J., and P.G., that was supervised by W.K.

**The Seizure of More Than 41 Kilograms of Cocaine in February 2009**

5. Prior to February 19, 2009, W.J. and C.J. told RIVERA that they had received information from a confidential informant about a large-scale narcotics trafficker operating out of a residence on the 1400 block of Ellamont Street, in Baltimore, Maryland.

6. On February 19, 2009, RIVERA, and other members of the squad were conducting surveillance in the 1400 block of Ellamont Street targeting an individual whose initials are T.M.  RIVERA and W.K. followed a car from that residence to a nearby school where RIVERA saw the driver throw something in a trash container.  Once the driver left, RIVERA and W.K. recovered the trash and found it to be empty kilogram drug wrappers. During this time other officers claimed to have followed a second individual who left the residence and who, the officers claimed, threw trash from the window of his vehicle. Those other officers claimed to have recovered the trash, which, they represented, contained cocaine residue.  RIVERA returned to the area around the residence and continued surveillance.

7. RIVERA and other officers remained at the house until W.J. and C.J. obtained a search warrant from a Baltimore City District Court judge.

8. Ultimately, RIVERA participated in the execution of a search and seizure warrant at the residence.  No drugs were found in the residence. RIVERA learned that drugs were recovered from a pick-up truck that was parked down the block.

9. Forty-one (41) kilograms of cocaine was turned into the BPD's Evidence Control Unit on February 20, 2009.

10. Later that day, a criminal complaint was filed in the United States District Court for the District of Maryland charging T.M. with possessing with intent to distribute five or more kilograms of cocaine.

### The Sale of Three Kilograms of Cocaine from the February 2009 Seizure

11. Subsequent to the seizure, RIVERA, K.G. and I.L. discovered 3 additional kilograms of cocaine in the surveillance van that had been used to transport the 41 kilograms that were turned in to BPD. These kilograms of cocaine had come from the seizure from T.M.'s pickup truck on February 19 and 20, 2009, but had not been turned into the BPD on February 20, 2009.

12. Rather than turn this cocaine into BPD, RIVERA, K.G. and I.L. agreed to sell the cocaine and split the proceeds from its sale.

13. RIVERA sold the cocaine to a confidential informant of his who trafficked in cocaine. The source proceeded to sell the cocaine in Baltimore City. RIVERA received the proceeds of the sale from his source and then shared them with K.G. and I.L. Ultimately, RIVERA received $20,000 in drug proceeds from the sale of the cocaine seized from T.M.'s pickup truck that had not been turned in to BPD.

### The FBI Interviewed the Defendant About the Cocaine Seizure in February 2009

14. As a law enforcement officer, RIVERA knew it was a crime to provide false information, or to conceal or cover up material facts, during voluntary interviews with federal law enforcement.

15. On March 1, 2017, seven members of the BPD's Gun Trace Task Force were arrested on federal racketeering charges, including W.J. Following the filing of charges, the FBI continued to investigate misconduct by members of the BPD.

16. On November 1, 2019, RIVERA agreed to participate in a voluntary interview with FBI task force officers ("TFOs"). RIVERA was told it was a crime to lie to the FBI TFOs interviewing him and he acknowledged he understood. The FBI TFOs questioned RIVERA about the seizure of cocaine on February 19 and 20, 2009. In that interview, RIVERA made a number of false statements and material omissions including, but not limited to, the following:

FBI TFO: Right. Okay. So then what happened? One.., once you guys found the drugs, what was like the next move?

RIVERA: Um.., all I remember is goin' back to Headquarters to layin' it out for the news.

* * *

FBI TFO: Did you ever hear of anybody taking any drugs or any money or anything like that from the incident?

RIVERA: No sir. No.

FBI TFO: Nothin' like that?

RIVERA: Well this is…

FBI TFO: And I'm not talkin' about seizure, I'm talkin' about like, you know, stealing or.., or whatever.

RIVERA: Yeah, right. No. I… There's been… This is…probably what.., where my name comes in. Is that was it is?

FBI TFO: Whatta you mean?

RIVERA: Am I being accused of…, of s.., taking something?

FBI TFO: (Sighs). Well we're not accusing you of it right now. We're talk… We're.., we're tryin' to get to the bottom of…,

RIVERA: Right.

FBI TFO: …you know...

RIVERA: Yeah, yeah. Hmph hmph.

FBI TFO: Yeah.

RIVERA: No.

* * *

FBI TFO: … You said here before.., 'cause I asked you before you… about a backpack. You don't remember anything about a backpack?

RIVERA: (Whispers). No.

* * *

FBI TFO: All right, so would it be…. So I'm gonna ask you this question even though I think you've already answered it. Um, you didn't take any drugs. Did you give any drugs to [RIVERA's confidential source]?

RIVERA: No.

FBI TFO: …to sell?

RIVERA: No.

FBI TFO: No?

RIVERA: And that's what's being said.

FBI TFO: Did you give any drugs to anybody else to sell other than [RIVERA's confidential source]?

RIVERA: No.

FBI TFO: All right.

RIVERA: Hmph hmph (no).

FBI TFO: Did… I mean this is… 'Cause, you know, I.., I'm gonna ask you anyway, but… So if you never gave drugs to [RIVERA's confidential source]

RIVERA: Right.

FBI TFO: …did [RIVERA's confidential source] ever give you money for drugs that he sold for you?

RIVERA: No.  Hmph hmph (no).

FBI TFO: No?  Okay.

RIVERA: (In a lower voice).  Hmph hmph (no).

FBI TFO: Did you ever…  (Slight Laugh).  Did you ever give any money to anyone else…

RIVERA: No.

FBI TFO: …from drug.., from sale of…

RIVERA: Hmph hmph.

FBI TFO: …those drugs?

RIVERA: No.

FBI TFO: Never gave any money to anybody else from your squad?

RIVERA: Ah, that… No.

\* \* \*

FBI TFO: …or I'll tell you what… Nah, that's like what your.., the allegation (Unintelligible) against you…, I'm not saying what it is but I tell you what the information we have is that um.., is that…

FBI TFO: …we have reason to believe that drugs were taken from that incident, okay? Um, there was…, you know, "X" amount of kilos that were recovered and submitted to Evidence, um, which are probably.., which reflected in that photograph…

RIVERA: Right.

FBI TFO: …and then that there was some evidence that there was some drugs that was taken, um, that was not submitted and that was subsequently pushed out and resold. That's the information that we have so mean I guess.., you know.., point blank, I mean do you know anything about that?

RIVERA: No.

FBI TFO: You don't know anything about that?

RIVERA: (In a lower voice). Hmph hmph (no).

\* \* \*

FBI TFO: So we.., you know.., we.., we talk… I'm not gonna lie to you. We talk.., we've talked to… You know, you're not the only person we've talked to. We have talked to a bunch of people, um, to include [T.M.], you know? [T.M.], you know…,

RIVERA: Hmph hmph.

FBI TFO: …is telling us that he had more drugs than what was seized.

RIVERA: Hmph hmph.

FBI TFO: Um…,

RIVERA:        (Clears throat).

FBI TFO:       …so that's kind of why we're here today.  Um.., and you don't know.., you don't know anything.., have any knowledge of any extra drugs being taken?

RIVERA:        No.

FBI TFO:       Don't have any knowledge of any black backpack?

RIVERA:        No.

FBI TFO:       Um, never gave any drugs to [RIVERA's confidential source]?

RIVERA:        No.

FBI TFO:       [RIVERA's confidential source] never gave you…

RIVERA:        Uh-uh.

FBI TFO:       …any money?

RIVERA:        No.  (Whispers).  Nah.

FBI TFO:       (Sniffs).  You never split any money with ah.., [Officer 1]…

RIVERA:        No.

FBI TFO:       …or [Officer 2]?  No?  No money?

(Small Pause).

RIVERA:        Why would.., why would I do that?

FBI TFO:       Well I'm just sayin'.  Ah, you know, I just wanna be thorough with the questions that I ask.  I wanna give you every opportunity to..,

RIVERA:        (Breathing Noise and/or a sigh).

FBI TFO:   …you know, if you.., maybe, maybe you'll remember something, I don't know.

RIVERA:    No.

## The Charge

17. On or about November 1, 2019, in the District of Maryland, the defendant,

**VICTOR RIVERA,**

did willfully and knowingly make a materially false, fictitious, and fraudulent statement and representation in a matter within the jurisdiction of the executive branch of the Government of the United States, by concealing and covering up material facts, namely, that he and two other officers had split the proceeds from the sale of three of the kilograms of cocaine that had been seized by BPD on February 19 and 20, 2009. RIVERA knew that the FBI was investigating police corruption and was questioning him about the seizures that day in order to determine if police misconduct had occurred.

18 U.S.C. § 1001.


Date:  April 15, 2020            _____/s/_____
                                 Robert K. Hur
                                 United States Attorney